UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AMANDA DELEAN SPENCER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-04077-JRS-MJD |
| | ) | |
| CINDY WEISNER, | ) | |
| HOLLY CALHOUN, | ) | |
| JOHN MARTOCCIA, | ) | |
| MATT MEYERS, | ) | |
| | ) | |
| Defendants. | ) | |

**Order Granting in Part and Denying in Part
Defendants' Motion for Summary Judgment**

Plaintiff Amanda Spencer, at relevant times an inmate at Bartholomew County Jail ("the jail"), brings this lawsuit alleging that the defendants provided inadequate medical care for a vaginal condition. The defendants seek summary judgment. For the following reasons, the motion for summary judgment, dkt. [35], is **granted in part and denied in part**.

**I. Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set

1

out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Trustees of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

## II. Statement of Facts

The following statement of facts has been evaluated pursuant to the standards set forth above. The facts are considered to be undisputed except to the extent that disputes are noted.

Ms. Spencer filed a response to the defendants' motion for summary judgment which consisted of a thirteen-page handwritten document in which she described her disagreement with the providers' medical decisions without citing to any admissible evidence. Dkt. 44. Further, the response is not verified, so the Court may not treat it as an affidavit. The Court agrees with the defendants that Ms. Spencer failed to comply with Local Rule 56-1(e) which requires "[a] party [to] support each fact the party asserts in a brief with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." But the Court will not disregard her response entirely. While it is "well established that pro se litigants are not excused from compliance with procedural rules," *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008), whether the Court holds pro se litigants to the consequences of violating the Court's Local Rules is a matter of discretion, *Gray v. Hardy*, 826 F.3d 1000, 1004-05 (7th Cir. 2016) (holding that district courts are not required to hold pro se litigants to the potential consequences of their failure to comply with the Local Rules and can instead take "a more flexible approach," including by ignoring the deficiencies in their filings and considering the evidence they submit). A flexible approach is warranted here to the extent that the Court will consider her arguments that are supported by evidence in the record.

### a.  Medical Care at Bartholomew County Jail

Medical care at the Bartholomew County jail is provided by a combination of nursing staff and a contract physician or nurse practitioner (NP). Dkt. 35-5 at ¶ 3. The nurses are employed by the sheriff, and the physician and NP are provided through a contract with Advanced Correctional

Health (ACH). *Id.* With respect to treatment orders, the nurses take direction from the provider and implement orders the provider issues. *Id.* According to Sheriff Matthew Myers, "[i]n a jail setting, conditions that do not pose a risk to an inmate's overall health may not be treated," and "[w]hether a particular condition requires treatment must be made by a qualified provider." *Id.*

After an inmate is booked into the jail, the inmate is supposed to undergo a medical assessment within 14 days of admission. Dkt. 35-1 at ¶ 7. At times, these assessments are delayed due to staffing issues and medical staff attending to more urgent issues. *Id.* However, inmates may obtain medical care at any time by sending a message through the jail's electronic kiosk system known as Keefe. *Id.* at ¶¶ 3, 7.

Communication between nurses and inmates is primarily through the kiosk. Dkt. 35-1 at ¶ 3. After reviewing a message, the nurse will speak to or examine the inmate and then convey her findings to the provider who will advise of any treatment orders. *Id.* The nurse implements the orders and communicates the provider's orders to the inmate and correctional staff. *Id.* If the provider issues no order, the nurse advises the inmate. *Id.* Nurses cannot prescribe medication or override the physician's order. *Id.* at ¶ 4. Often times inmates will send messages through Keefe arguing with the physician's orders, and the nurses often respond by reiterating the physician's order and offering non-medical suggestions. *Id.*

When the nurses go into cellblocks to see particular inmates, often other inmates will attempt to talk to them about their issues. Dkt. 35-3 at ¶ 7. While occasionally Nurse Holly Calhoun would take such an inmate to a private area to discuss his or her issue, it is usually inefficient for the nurse to attempt to address an inmate's need without the medical record or adequate time or information to assess the matter. *Id.* Therefore, the nurses usually instruct these inmates to send a message through the kiosk so that their needs can be properly assessed and

prioritized. *Id.*

### b. The Parties

Defendants Lucinda Weisner and Holly Calhoun are licensed practical nurses (LPN) and worked at the jail during the events set forth in the amended complaint. Dkts. 35-1 at ¶ 1; dkt. 35-3 at ¶ 1. Nurse Weisner remains employed at the jail. Dkt. 35-1 at ¶ 1. Nurse Calhoun left employment in December 2019 and had no role in Ms. Spencer's medical care after her departure. Dkt. 35-3 at ¶¶ 1−2.

Defendant Matt Myers is the sheriff of Bartholomew County. Dkt. 35-5 at ¶ 1. Defendant John Martoccia is the jail commander. Dkt. 35-4 at ¶ 1. Neither Sheriff Myers nor Officer Martoccia have medical training beyond CPR and basic first aid. *Id.* at ¶ 4; dkt. 35-5 at ¶ 3. Sheriff Myers is not involved in day-to-day jail operations, so when he receives letters from inmates with medical complaints he refers them to Officer Martoccia. Dkt. 35-5 at ¶ 5.

Officer Martoccia is responsible for responding to inmate grievances. Dkt. 35-4 at ¶ 5. When an inmate submits a grievance about medical care, Officer Martoccia will confer with the nurse or provider about the inmate's condition and then respond to the grievance or speak with the inmate. *Id.* Although inmates often expect him to overrule the provider and order different care, he is not qualified to do so unless there is an apparent life-threatening emergency. *Id.*

Ms. Spencer was incarcerated at the jail at all times relevant to the amended complaint.

### c. Ms. Spencer's Relevant Medical History

Ms. Spencer was diagnosed with herpes simplex virus (HSV) at some point after the birth of her daughter in 2001. Dkt. 35-7 at 20 (26:21-25).[1] During previous periods of incarceration at

---

[1] Exhibit Seven consists of excerpts of the plaintiff's depositions. The defendants are reminded that, pursuant to the Court's pretrial schedule, they were required to attach the entire deposition transcript if they relied on any part of the plaintiff's deposition in their motion. Dkt. 28 at 5−6.

the jail and the Indiana Department of Correction (IDOC), Ms. Spencer had complaints of vaginal discharge and yeast infections and at one point received abnormal PAP smear results. Dkt. 35-2 at 101−02, 105, 145, 186 (Bartholomew County Jail medical records 2016−2018) and dkt. 35-6 at 118−20, 135−37, 343−48, 356−58) (IDOC medical records 2013, 2017−2018). For these issues she received Bactrim (an antibiotic), Diflucan (an antifungal), Aciclovir (an antiviral); Fluconazole (an antifungal); and Flagyl (an antibiotic). *Id.*

### d.  Ms. Spencer's Arrest

Ms. Spencer was arrested on March 22, 2019, after the car in which she was riding was stopped. Dkt. 35-8 at 15. She was on home detention through Bartholomew County Community Correction and was not authorized to be away from her home at that time. *Id.*; dkt. 35-7 at 33−34 (86:24-25, 87:1). Before the car stopped, a passenger gave Ms. Spencer a bag with drugs which she put in her vagina. Dkt. 35-7 at 35 (88:9-15). Ms. Spencer was arrested, and because someone told the arresting officer that Ms. Spencer had drugs inside her, she was taken to the Johnson County jail for a body scan and then to a nearby hospital to remove the object. *Id.* at 35 (88:17-19) and 42 (95:25, 96:1-9). The object removed was a clear bag with other bags inside containing various drugs, including Suboxone, heroin, cocaine, and methamphetamine. Dkt. 35-8 at 16.

At the time of her arrest, Ms. Spencer was on home detention serving a sentence for dealing in cocaine or a narcotic drug. Dkt. 35-7 at 27 (80:16-17); dkt. 35-8 at 5; *see also* Chronological Case Summary, *State v. Spencer*, Case Number 3C01-1102-FB-000948, *available at* mycase.in.gov (reflecting Ms. Spencer was approved to serve the rest of her sentence in the Community Transition Program on August 31, 2018). The arrest resulted in Ms. Spencer being jailed on both the new charges and for violating the terms of the Community Transition Program. *Id.* at 33−35 (86: 24-25, 87:1-2, 88:17-19).

**e.   Ms. Spencer's Medical Care at the Jail**

Ms. Spencer received a medical screening upon being booked into the jail on March 22, 2019, during which she did not report any vaginal issues. Dkt. 35-2 at 57. Although Ms. Spencer's more comprehensive assessment did not occur until May 10, she had other medical contacts before then to address drug withdrawal and blood pressure medication. Dkt. 35-1 at 184−87, dkt. 35-2 at 55−56.

Ms. Spencer first reported vaginal symptoms at her initial assessment with Nurse Calhoun on May 10, 2019. Dkt. 35-1 at 163, dkt. 35-7 at 59−60 (115:25, 116:1-11). For the question "STDs (recent, past, or present)?" a box was checked "no," and there was an annotation, "not dx'd- has current discharge." Dkt. 35-1 at 163. Nurse Calhoun also completed a medical progress note documenting that Ms. Spencer complained of a yellow mucus-like discharge that itched and had a fishy order which she had experienced for three weeks. *Id.* at 162. She further noted Ms. Spencer's last menstrual cycle was in January 2019 and that she reported wearing pads for the discharge. *Id.* Nurse Calhoun reported these symptoms to Dr. Everson, who had no new orders. *Id.* Dr. Everson reviewed and signed the note. *Id.*

About one month later, Ms. Spencer initiated an exchange on the kiosk on June 14, 2019, inquiring about the same vaginal issue. Dkt. 35-1 at 47. Before responding, Nurse Weisner reviewed Ms. Spencer's medical record and saw that Dr. Everson did not issue any orders for the discharge complaint on May 10 and so informed Ms. Spencer. Dkt. 35-1 at 4, 47. In response to Ms. Spencer's contention that her symptoms had worsened, Nurse Weisner asked how they had worsened. *Id.* at 47. Ms. Spencer said the discharge had an extreme foul odor, itched, and was bright yellow. *Id.* She also referred to her history of vaginal problems and having "a lot" of drugs inside her before her arrest. *Id.*  Nurse Weisner responded that the symptoms were the

same as those reported on May 10 and for which the doctor had no orders. *Id.* She advised Ms. Spencer to increase fluid intake, stop wearing tampons, and to change pads frequently to alleviate her symptoms. *Id.*

Ms. Spencer submitted a grievance dated June 18, 2019, stating she had sought medical care for an "issue" and that the medical department had refused treatment. Dkt. 35-4 at 3, 8. Officer Martoccia responded to the grievance stating that he would consult with medical staff but that the doctor had said no new orders. *Id.* at 8.  Because Officer Martoccia lacks medical training beyond CPR and basic first aid, he relies on the nurses for information about inmates' medical care and the providers to determine whether treatment is needed. *Id.* at 2.

Ms. Spencer next sought medical care on August 13, 2019, for an apparent abscess on her stomach. Dkt. 35-1 at 47-48. When Nurse Weisner saw her on August 15, Ms. Spencer reported that the abscess was much better. *Id.* at 159. There is no record of her complaining of her vaginal symptoms during this visit. *Id.* Nurse Weisner reported her findings from the visit to NP Roy Washington, who had no new orders. *Id.* On August 26, he ordered Tylenol for swelling on Ms. Spencer's right knee, and again there was no record of a complaint of vaginal symptoms at that time. *Id.*

Sometime in August, Ms. Spencer wrote a letter to Sheriff Myers stating that she was not provided medical care for her vaginal symptoms and other matters including charges for medical care. Dkt. 35-7 at 67-68 (130:18-25, 131:1-7). Sheriff  Myers recalls receiving a letter from a female inmate about vaginal issues.[2] Dkt. 35-5 at 2. Per his usual practice when he receives letters from inmates about individual issues, he gave the letter to Officer Martoccia to handle. *Id.*  Officer Martoccia went to Ms. Spencer's cell with the letter. Dkt. 35-7 at 68 (131:8-

---

[2] The parties agree that this letter was sent in August, but the letter has not been located.

15, 22-23).  Officer Martoccia recalled Ms. Spencer stating that she believed she needed treatment for her gynecological issues. Dkt. 35-4 at 3. After she told him about the issue she was experiencing, he said he would get back to her but did not do so. Dkt. 35-7 at 68 (131:22-24). Officer Martoccia believes that he would have inquired to medical staff about Ms. Spencer's care and treatment, and based on what he was told, he was satisfied that her needs were being met. Dkt. 35-4 at 3.

Having not heard back from Officer Martoccia, Ms. Spencer submitted a grievance dated August 26, 2019, referring to her "issue" and her prior discussion with Officer Martoccia. Dkt. 35-4 at 3-4, 9.  He "missed" this grievance and did not find it until around November 26. *Id.* at 3−4.

Nurse Weisner saw Ms. Spencer on September 3, 2019, for a complaint of a staph on her vagina. Dkt. 35-1 at 154. She noted an apparent infection in the pubic and anal areas. *Id.* NP Washington ordered the antibiotic Bactrim. *Id.* On September 11, Ms. Spencer sent a kiosk message reporting a white cloudy discharge with odor that she believed was a yeast infection. *Id.* Nurse Weisner conveyed these complaints to NP Washington on September 12, and he prescribed Fluconazole, a medication used to treat yeast infections. *Id.* at 4, 155.  Nurse Weisner advised Ms. Spencer of the order via the kiosk. *Id.* at 50. The following day, Ms. Spencer saw Nurse Calhoun for a blood pressure issue. *Id.* at 150.  There was no record of a complaint of vaginal issues, *id*, though it would have been Nurse Calhoun's practice to document it if Ms. Spencer had complained, dkt. 35-3 at 2−3.

Nurse Weisner next saw Ms. Spencer on September 17 for knee pain, and during that visit Ms. Spencer requested hypoallergenic soap for her private area. Dkt. 35-1 at 149. Nurse Weisner conveyed these requests to NP Washington who had no new orders. *Id.*

On September 19, Ms. Spencer sent a kiosk message complaining of vaginal pain and blisters on her vagina. Dkt. 35-1 at 52. Nurse Calhoun reviewed her prior records and saw that she had been treated with Acyclovir for a herpes outbreak at DOC. Dkt. 35-1 at 146; dkt. 35-2 at 36. She reported this information to NP Washington, and he prescribed Acyclovir. Dkt. 35-1 at 5, 146.

Also on September 19, Ms. Spencer submitted a grievance stating,

> I have put in a lot of requests and grievances pertaining to an issue I have in regards to my vagina area. This has been an ongoing problem about 3 wks. after I got here in March. I have told the nurses and all I ever get told is no new orders, drink water and don't use tampons. My issue is way worse than what they are telling me to do about it. I have spoke with John Martoccia after I couldn't get anything accomplished with medical. He assured me he would get back with me and never did.

Dkt. 35-4 at 10 (errors in original). Officer Martoccia did not see this grievance until November 26. *Id.* at 4, ¶¶ 9−10.

Ms. Spencer continued to complain of vaginal symptoms including pain and blistering. She submitted a kiosk message on September 22 stating, "I would like to know if there is someone available to take photographs of my vagina area. I been having issues since I got here. This started internal and is now external visible red swollen, blistered and extremely painfull due to medical neglegance. I would like pictures for further processing. Thank u." Dkt. 35-1 at 52 (errors in original). On September 23, Nurse Calhoun advised her via kiosk to continue to take her prescribed medication, not to touch the area, and to wear only cotton. *Id.* In response to Ms. Spencer's October 1 kiosk message that she thought her "antibiotic" gave her a yeast infection, Nurse Calhoun responded on October 2 that she was on an antiviral medication. *Id.* at 53. Ms. Spencer said via kiosk on October 9 that she wanted to see a "real MD" for her issue. *Id.* On October 10, Nurse

Calhoun told her that there would be a charge on her inmate account[3] and that putting her on the list to be seen during the provider's next visit to the jail was not a guarantee that the provider would determine that a visit was necessary. *Id.*

NP Washington saw Ms. Spencer on October 16, 2019, and he ordered a culture and susceptibility (C&S) swab. Dkt. 35-1 at 138. The original plan was to order the collection kit, obtain the sample at the jail, and send it to a lab for testing. Dkt. 35-3 at 4. Nurse Calhoun ordered the kit and had multiple conversations with the supplier. *Id.* When she learned that the sample would need to be collected with a speculum, she told NP Washington that use of a speculum was beyond the scope of her practice as an LPN. *Id.* Officer Martoccia then authorized Ms. Spencer to be taken to an outside gynecologist for examination and testing. *Id.*; dkt. 35-4 at 4.

Ms. Spencer was examined by a nurse practitioner at Southern Indiana OB/Gyn on October 25. Dkt. 35-1 at 137. Per the jail medical treatment form completed by the nurse practitioner, the provider advice indicated that test results would be faxed upon receipt, a GI or primary care physician referral was recommended, and Ms. Spencer should continue the Acyclovir. *Id.* The evaluation section indicated that Ms. Spencer had reported vaginal itching and burning, recent blisters, a history of HSV, and abdominal pain. *Id.* The diagnosis section indicated vaginal swabs for testing, urine sample obtained, pelvic and uterine exam with no pain, abdomen diffuse with pain upon palpitation, and reported history of stomach problems. *Id.*

On October 29, the jail medical office received a call from Southern Indiana OB/Gyn stating that Ms. Spencer's blood work and urine were normal, and PAP and culture results were pending. Dkt. 35-1 at 131. Southern Indiana OB/Gyn reported on November 4 that the PAP result was normal, but Ms. Spencer tested positive for trichomoniasis, bacterial vaginosis, and

---

[3] Ms. Spencer believed that she was an inmate of the IDOC and therefore was erroneously being charged a co-pay for medical visits. Dkt. 35-7 at 80 (168:20−25).

ureaplasma. Dkt. 35-1 at 120. Trichomoniasis is a common STD that is caused by a parasite, and symptoms experienced by women include itching, burning and redness of the genitals and a change in vaginal discharge.[4] Bacterial vaginosis is a condition that happens when there is too much of a certain bacteria in the vagina, and symptoms also include pain, itching, or burning, and unusual discharge.[5] Ureaplasma is a bacteria commonly found in a person's urinary tract which can cause abnormal discharge.[6] The recommended treatment for these conditions was Flagyl and Azithromycin, both antibiotics. Dkt. 35-1 at 120. Nurse Weisner conveyed this information to NP Washington, and he prescribed these medications. *Id.* When Ms. Spencer inquired via kiosk about the result on November 1, Nurse Weisner responded on November 4 saying she would discuss it with her in person. *Id.* at 55. She also provided Ms. Spencer with patient education materials per her request regarding each diagnosis. *Id.* at 6, 109-19.

Ms. Spencer sent a kiosk message on November 17 stating that she wanted to go back on Acyclovir. Dkt. 35-1 at 56, 105-06. Because Ms. Spencer's HSV result was not reported, Nurse Calhoun contacted Southern Indiana OB/Gyn and was advised that the test was negative for herpes. *Id.* at 107; Dkt. 35-3 at 4. Nurse Calhoun reported the test result and Ms. Spencer's request to NP Washington who had no new orders, and Nurse Calhoun conveyed this to Ms. Spencer via kiosk. Dkt. 35-1 at 56, 106; dkt. 35-3 at 4-5.

Nurse Calhoun next saw Ms. Spencer on November 21 for a small abscess, and Ms. Spencer inquired about the HSV test result. Dkt. 35-1 at 95. Nurse Calhoun assured

---

[4] Centers for Disease Control and Prevention, "Trichomoniasis—CDC Fact Sheet," https://www.cdc.gov/std/trichomonas/stdfact-trichomoniasis.htm# (page last reviewed July 22, 2021).

[5] Centers for Disease Control and Prevention, "Bacterial Vaginosis—CDC Fact Sheet," https://www.cdc.gov/std/bv/stdfact-bacterial-vaginosis.htm (page last reviewed Jan. 5, 2022).

[6] Jennifer Berry, "What is Ureaplasma?," Medical News Today (Apr. 26, 2018), https://www.medicalnewstoday.com/articles/321636

Ms. Spencer the result was negative and reiterated that Acyclovir would not be prescribed. *Id.* She also documented that Ms. Spencer said she had blisters in her private area and was wearing pads which she changed four times per day. *Id.* Nurse Calhoun advised her to not wear pads due to possible friction. *Id.*

Around November 26, Officer Martoccia located the grievances Ms. Spencer had submitted in August and September. Dkt. 35-4 at 4. He and Sgt. Courtney Fisher met with Ms. Spencer to follow up. *Id.*; dkt. 35-7 at 71, 76 (134:16-25, 164:9-25). Officer Martoccia asked if everything had been taken care of referring to the grievances. Dkt. 35-7 at 76 (164:16-18). When he asked if she was still having problems, Ms. Spencer said she was still having discharge, but it was not as bad as before. *Id.* at 76 (164:22-25). She asked if she was going to have a follow up appointment. *Id.* at 77 (165:1-3). Officer Martoccia said he was not sure, "but he would let them know that [she] needed to be followed up on." *Id.* at 77 (165:4-5, 16−17). He then mentioned a pad check, and she said medical had not mentioned it to her, but she did not think it was necessary because she had already been diagnosed and given medication. *Id.* at 86, 87 (179:25, 180:1−10). She thought a follow up visit with either the jail provider or the gynecologist would help get to the bottom of why she was still experiencing discharge. *Id.* at 87 (180:10-18).

Officer Martoccia answered the September 19 grievance, in which he recounted the November 26 conversation and that his understanding was that medical staff recommended a pad check and that Ms. Spencer did not feel it would help. Dkt. 35-4 at 10. Officer Martoccia closed by noting that the pad check was recommended and that he would forward Ms. Spencer's concerns to medical. *Id.*

NP Washington saw Ms. Spencer on November 27 for a rash in her pubic area. Dkt. 35-1 at 93. He prescribed Miconazole cream which Ms. Spencer was allowed to keep with her. *Id.* Ms.

Spencer requested and received refills of the cream throughout her remaining time at the jail. *Id.* at 7, 12, 56-60.

During a visit with Nurse Weisner on December 30, 2019, she documented that Ms. Spencer complained of vaginal and anal discomfort and warts on her anus. *Id.* at 87. Nurse Weisner reported the complaints to NP Washington who said he would see her in his next clinic. *Id.* During an exam on January 8, 2020, he told Ms. Spencer that he was continuing the Miconazole cream. Dkt. 35-8 at 39. The progress note documented that the visual exam showed no legions and that Ms. Spencer had tested negative for herpes in October 2019. Dkt. 35-1 at 82.

Ms. Spencer did not report vaginal symptoms again until June 16, 2020. *Id.* at 12. In response to her kiosk message, nurse Abby Drake asked multiple questions about her symptoms. *Id.* Ms. Spencer responded, described her symptoms, and reported an onset of about three weeks earlier. *Id.* She said that she was not sure if the condition was bacterial vaginosis or ureaplasma, but the area was "abnormal and itchy." *Id.* at 13. Nurse Drake responded that the provider was informed and ordered Flagyl, which Ms. Spencer received. *Id.*

Nurse Weisner completed the medical summary to be sent to IDOC on June 19. Dkt. 35-1 at 7. Current medications included, amongst others, miconazole (an anti-fungal cream) and metronidazole (generic for Flagyl). *Id.* at 21.

Ms. Spencer was transported to IDOC and underwent a medical intake on June 23, 2020. Dkt. 35-6 at 109. She reported her history of gynecological issues. *Id.* at 110. Over the next several months, Ms. Spencer was treated for genital warts and was prescribed several rounds of antibiotics to treat her continuing discharge-related issues. *Id.* at 31-33, 37-46, 55-57, 59-61, 71-74, 76-80, 90.

Ms. Spencer testified at her April 5, 2021, deposition that she still experiences vaginal

symptoms. Dkt. 35-7 at 97 (193:13). She testified that Nurse Weisner did not appreciate the seriousness of her condition and believed the nurse should have provided a "clear and factual" understanding of her issues to the provider, though she lacked direct knowledge of Nurse Weisner's communications with him. *Id.* at 57, 107−08 (113:20-25, 208:14-19, 209:3-4). Ms. Spencer had been to jail several times and never previously had a problem obtaining medical care, so she was surprised when she was refused treatment. *Id.* at 107−08 (208:25, 209:2-3).

Ms. Spencer had similar beliefs about Nurse Calhoun. *Id.* at 108 (209:17). She thought both nurses as women should have put themselves in her position and advocated more on her behalf as the "middlemen" between her and the doctor because Ms. Spencer was unable to communicate directly with him. *Id.* at 108−09 (209:20-21, 210:1-4).

Ms. Spencer testified that Officer Martoccia had always been decent to her, and she never had direct contact with Sheriff Myers regarding her vaginal complaints. *Id.* at 110 (211:1−6). However, she felt that both of them were responsible for making sure inmates' medical needs were met, and neither helped. *Id.* at 110 (211: 9-13, 22). She contended that "nothing was done" for four or five months until she submitted multiple grievances and that she should not have had to wait that long. *Id.* at 110−11 (211:23-25, 212:1-3). During one conversation she had with Officer Martoccia in the cellblock, she confronted him about not responding to her grievances about her medical issues, and he responded, "Well, is it life-threatening? Because we don't have to treat you unless it's life-threatening." Dkt. 35-7 at 116 (217:9−24).

Ms. Spencer also believes that she should have had a follow up appointment with the gynecologist when she was at the Bartholomew County jail and/or tried different medications *Id.* at 111 (212:12-22). The medications provided after the gynecologist visit helped, but Ms. Spencer believed they did not completely eliminate the infection. *Id.* at 112 (213:19-22) Though she has

had previous vaginal infections, none have lasted this long. *Id.* at 112−13 (213:25, 214:1-2). However, no provider has told Ms. Spencer that any lack of or delayed treatment at the jail has adversely affected their ability to treat her present symptoms. *Id.* at 206 (207:5-11).

### III. Discussion

Ms. Spencer alleges that the defendants provided constitutionally inadequate medical care while she was incarcerated at the jail. Ms. Spencer was in custody for violating the terms of her community corrections placement and also received new charges at the time of her arrest. This is relevant because the Seventh Circuit has clarified that a pretrial detainee's medical care claim brought under the Fourteenth Amendment is subject only to the objective unreasonableness inquiry identified in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), rather than the deliberate indifference standard used for convicted prisoners. *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018).

Since *Miranda*, neither the Seventh Circuit nor district courts have decided whether an individual held on new charges and on a probation violation petition is a pretrial detainee or a convicted prisoner. Previously, the Court described this inquiry as "academic" because the same standard applied in either circumstance. *Palmer v. Marion County*, 327 F.3d 588, 593 (7th Cir. 2003). After *Miranda*, the inquiry is no longer "academic" but remains unresolved, and, accordingly, the defendants analyzed Ms. Spencer's claims under both the Fourteenth Amendment and Eighth Amendment standards.

Under *Miranda*, the proper inquiry in the case of a pretrial detainee involves two steps. "The first step, which focuses on the intentionality of the individual defendant's conduct, remains unchanged and 'asks whether the . . . defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case.'" *McCann*

16

*v. Ogle Cty., Ill.*, 909 F.3d 881, 886 (7th Cir. 2018) (quoting *Miranda*, 900 F.3d at 353). In the second step, a plaintiff must demonstrate the defendant's conduct was objectively unreasonable. *Miranda*, 900 F.3d at 353. This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable. *McCann*, 909 F.3d at 886. "A detainee must prove more than negligence but less than subjective intent–something akin to reckless disregard." *Miranda*, 900 F.3d at 353. "Said more succinctly, [the plaintiff] must demonstrate that genuine issues of material fact exist on two questions: (1) whether [s]he suffered from an objectively serious medical condition and (2) whether the medical staff's response to it was objectively unreasonable." *Williams v. Ortiz*, 937 F.3d 936, 942–43 (7th Cir. 2019).

If, however, Ms. Spencer should be treated as a convicted felon due to her status as a probation violator, her treatment and the conditions of her confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment, since prison officials have a duty to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, she must demonstrate two elements: (1) she suffered from an objectively serious medical condition; and (2) the defendant knew about her condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014). The second prong of the inquiry is a subjective rather than objective analysis, and thus is a more difficult standard to meet than the standard under the Fourteenth Amendment. *See McCann*, 909 F.3d at 886 ("A pretrial detainee 'needed only to show that the defendant's conduct was *objectively* unreasonable,' without any

accompanying requirement to demonstrate, as would be the case in a claim brought under the Eighth Amendment's Cruel and Unusual Punishment Clause …, 'that the defendant was *subjectively* aware " that the medical care was unreasonable.) (quoting *Miranda*, 900 F.3d at 351).

Again, under either analysis, Ms. Spencer must first show that she suffered from a serious medical condition. When evaluating whether a medical need is serious, the court looks "for physical injury 'that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic pain.'" *Gray v. Hardy*, 826 F.3d 1000, 1007 (7th Cir. 2016) (quoting *Hayes v. Snyder*, 546 F.3d 516, 325 (7th Cir. 2008)); *see also Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (noting that "a medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.") (cleaned up).

The defendants argue that Ms. Spencer's initial vaginal complaints were not serious conditions because the provider determined that they warranted no treatment. Dkt. 39 at 21. But whether her condition was serious as of May 10, 2019, when she first reported her symptoms goes to the core of Ms. Spencer's complaint. Ms. Spencer was ultimately diagnosed with three infections that required antibiotics. *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (noting that a condition is serious if it is diagnosed by a doctor as needing treatment). There are disputes of material fact as to whether Ms. Spencer's gynecological issues were objectively serious medical needs that required a doctor's attention. The Court proceeds to analyze how the defendants responded to those needs.

### A. Nurse Weisner and Nurse Calhoun

In their position as licensed practical nurses, neither Nurse Weisner nor Nurse Calhoun could prescribe medication or order a particular treatment. Rather, they communicated information to the providers and implemented their orders. They argue that they cannot be liable because they were entitled to rely on the providers' judgment as to the appropriate care for Ms. Spencer's symptoms.

Although jail nurses are generally able to defer to a provider's medical judgment, such "deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient." *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010). In *McCann*, the Seventh Circuit held that a jail nurse who administered a fatal dose of methadone in accordance with the physician's prescription did not act objectively unreasonably because it was not her role to second-guess the doctor's medical judgment with respect to the proper dosage. 909 F.3d at 887. But that is distinguishable from this case in which the provider ordered no treatment and did not even see Ms. Spencer for several months.

Recall the timeline of events. Ms. Spencer first reported her symptoms to Nurse Calhoun on May 10, 2019. Dkt. 35-1 at 163. Nurse Calhoun communicated the symptoms to Dr. Everson who took no action. *Id.* On June 14, Ms. Spencer alerted Nurse Weisner via the kiosk that her symptoms had worsened and that she needed medical attention. *Id.* at 47. Nurse Weisner asked how her symptoms had changed, and at this point, Ms. Spencer stated that she had "an extreme foul oder itch and is bright yellow" and brought up that she has a "history of vaginal problems and had a lot of drugs inside [her] before [her] arrest." *Id.* (errors in original). Nurse Weisner did not tell the provider that Ms. Spencer's symptoms were worse. Rather, she reviewed the treatment notes from May 10 and on June 28—two weeks after the kiosk exchange started—repeated that

19

Dr. Everson had no new orders for her. *Id.*  Ms. Spencer filed a grievance on June 18 and spoke

with Officer Martoccia about the lack of treatment for her issues, and he returned the grievance on

June 27, also stating the doctor had no new orders. Dkt. 35-4.

Ms. Spencer was seen by Nurse Weisner on August 15 for an unrelated abscess. Dkt. 35-1

at 159. There is no record that she complained about her vaginal symptoms during this visit. *Id.*

But at some point in August, Ms. Spencer wrote a letter to Sheriff Myer complaining that her

vaginal symptoms were being ignored, indicating that—even if it was not formally documented in

treatment notes—Ms. Spencer was still communicating her frustration to nursing staff to no avail.

On September 19, Ms. Spencer again complained about her symptoms and filed a grievance

stating her issue was being ignored and was "way worse" than reflected in the nurses' advice.

Dkt. 35-1 at 52; dkt. 35-4 at 10. Without examining her, NP Washington prescribed antiviral

medication for a suspected HSV outbreak and then an antibiotic for a suspected yeast infection.

Dkt. 35-1 at 52, 146.

On October 9, Ms. Spencer requested to see a "real MD" for her ongoing issues. *Id.* at 53.

Nurse Calhoun responded on October 10 that she would put her on the list but that would not

guarantee a visit. *Id.*

NP Washington finally saw Ms. Spencer on October 16, more than five months after

Ms. Spencer first reported her symptoms. *Id.* at 138. He ordered that a culture be taken and—

because that was something that could not be performed at the jail—Ms. Spencer was approved to

see an outside gynecologist for examination and testing on October 25. *Id.* at 137.

A reasonable juror could conclude that Nurses Calhoun and Weisner were deliberately

indifferent to Ms. Spencer's serious medical needs. First, a juror could conclude that Nurse Weisner

acted independently during her mid-June kiosk interactions with Ms. Spencer when she failed to

communicate Ms. Spencer's newly provided information—that her symptoms had worsened, that she had a history of vaginal conditions, and that she had placed drugs inside her person—to the provider and instead told Ms. Spencer that Dr. Everson had no orders for her. *Berry*, 604 F.3d at 443 (finding that jury could conclude that nurse acted independently and hold her liable for delay in dental treatment where she did not confer with doctor again after plaintiff expressed ongoing pain and ineffectiveness of treatment).

Second, to the extent that the nurses did consult with the medical provider, "a jury could question whether [they] could justifiably defer" to the providers' opinions regarding Ms. Spencer's ongoing complaints. *Id.* Both nurses were aware of Ms. Spencer's ongoing issues, but neither of them took any affirmative action to have her examined by the provider until October, when, in response to Ms. Spencer's request to see "a real MD," Nurse Calhoun said she would place her on the list but could not guarantee an examination would occur. Dkt. 35-1 at 53; *see Turman v. Hawley*, 40 F. App'x 284, 287 (7th Cir. 2002) ("explaining that medical professionals who know that they serve as a 'gatekeeper' for other medical personnel capable of treating a serious condition may be liable if they delay or refuse to fulfill their 'gatekeeper role'") (citing *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000)). Because a jury could find the nurses were deliberately indifferent under the Eighth Amendment, it follows that they jury likewise could find they acted unreasonably under the Fourteenth Amendment.

Because there are disputes of material fact as to whether the nurses were deliberately indifferent to Ms. Spencer between May 10, 2019, when she first advised of her medical issue, until October 10, when Nurse Calhoun placed Ms. Spencer on a list to be examined, summary judgment must be **denied** as it relates to her treatment during this timeframe.

Summary judgment must be **granted**, however, to the nurses for Ms. Spencer's medical care once she was referred to the medical provider and a treatment plan was set into motion. The nurses communicated the test results from her gynecological exam to the provider, who prescribed antibiotics. They provided educational materials and follow-up care in the ensuing months. Although Ms. Spencer testified during her deposition that she believed a follow-up appointment with the gynecologist was warranted, dkt. 35-7 at 111 (212:12-22), there is no evidence in the medical records that she communicated this concern with Nurses Calhoun and Weisner after the October exam. Instead, the records show that as she reported ongoing symptoms, the nurses reported the same to the provider who in turn prescribed medication.

### B.  Officer Martoccia

"When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention." *Miranda*, 900 F.3d at 344. Thus, jail officials will not be found deliberately indifferent where they "reasonably relied on the judgment of medical personnel." *Id.* (citing *Greeno v. Daley*, 414 F.3d 645, 655−56 (7th Cir. 2005); *Estate of Perry v. Wenzel*, 872 F.3d 439, 458−59 (7th Cir. 2017)). Liability is possible, however, "if jail officials had reason to know that their medical staff were failing to treat or inadequately treating an inmate[.]" *Id.*; *see also Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015) ("[O]nce an official is alerted to an excessive risk to inmate safety or health through a prisoner's correspondence, refusal or declination to exercise the authority of his or her office may reflect deliberate disregard.").

Officer Martoccia first became aware that Ms. Spencer was concerned about her medical treatment in a grievance submitted on June 18, 2019. Dkt. 35-4 at 3. He conferred with medical staff and told Ms. Spencer that the doctor had no orders for her. *Id.* This initial reliance may have

been reasonable. But then he spoke to Ms. Spencer about the letter she sent to Sheriff Myers, and at this point she advised him that she needed medical treatment for her gynecological issues. *Id.* He said he would speak to medical staff. *Id.* He attested, "To the best of knowledge, I was told that Spencer the provider was aware of her issued and had ordered treatment for certain conditions. Based on these discussions, I determined that Spencer's medical needs were being assessed and addressed." *Id.* (errors in original). Officer Martoccia does not actually remember speaking to medical staff at this time. And Ms. Spencer recalls that during one of their conversations about her ongoing issue, he told her that the jail was not required to treat the issue if it was not life-threatening. Dkt. 35-7 at 116 (217:9−24). This statement is consistent with the jail's ambiguous policy that some conditions will not be treated by jail medical personnel if "the provider has determined that the condition in question will not risk a deterioration of the inmate's overall health." Dkt. 35-4 at 2. Thus, there is a material dispute as to whether Officer Martoccia was aware of Ms. Spencer's lack of treatment and turned a blind eye. *Perez*, 792 F.3d at 782. And there is no doubt that Officer Martoccia had the ability to intervene, since he is the official who authorized Ms. Spencer to be seen by a provider at the ob/gyn clinic in October. However, as with the nurses, because no reasonable juror could find that he was deliberately indifferent to her needs after she was placed on the list to see the nurse practitioner, thereby setting a treatment plan into motion, summary judgment must be **granted** for this period.

Because a reasonable jury could conclude that Officer Martoccia was aware that Ms. Spencer was receiving no medical care between May 10, 2019, and October 10, 2019, and turned a blind eye to her serious medical need, summary judgment is **denied**. Because a jury could find he was deliberately indifferent under the Eighth Amendment, it follows that they jury likewise could find he acted unreasonably under the Fourteenth Amendment.

### C.  Sheriff Myers

"Individual liability under § 1983 … requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted). "Liability under § 1983 is direct rather than vicarious; supervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018).

The only direct involvement Sheriff Myers had with Ms. Spencer's medical care was reviewing the letter she sent him. Dkt. 35-5 at 2. Because he has no day-to-day involvement in jail operations, he referred the letter to Officer Martoccia to investigate. *Id.* He did not receive any additional complaints from Ms. Spencer that would have put him on notice that she was not receiving medical care. To the extent he was put on notice of Ms. Spencer's medical issue, he reasonably deferred to his jail commander to investigate it. *Miranda*, 900 F.3d at 343. Sheriff Myers is therefore entitled to summary judgment.

### D.  Qualified Immunity

The defendants argue that they are entitled to qualified immunity. "Qualified immunity is a doctrine that protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (cleaned up). Once a defendant raises qualified immunity as a defense, the burden shifts to the plaintiff to defeat it by showing "two elements: first, that the facts show a violation of a constitutional right, and second, that the constitutional right was clearly established at the time of the alleged violation." *Id.* (cleaned up). "'If *either* inquiry is answered in the negative, the defendant official' is protected by qualified

immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (quoting *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (emphasis in original)). The Court can consider the elements in either order. *Id.*

Viewing the evidence in the light most favorable to Ms. Spencer, a reasonable jury could conclude that Nurse Weisner, Nurse Calhoun, and Officer Martoccia were deliberately indifferent to her serious medical needs. Thus, moving to the second element, Ms. Spencer must "show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Leiser*, 933 F.3d at 701 (quoting *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017)). She need not find "a case on all fours with the facts here," but she must point to "some settled authority that would have shown a reasonable [person] in [the defendant's] position that her alleged actions violated the Constitution." *Id.* at 702 (cleaned up). The Court must look at the "specific context of the case" to determine "whether the violative nature of particular conduct is clearly established." *Id.* (internal citation and quotation marks omitted).

It is clearly established that inmates are entitled to medical care and that nurses may be liable if they unreasonably rely on the medical provider's treatment decision. *Berry*, 604 F.3d at 443. Here, Ms. Spencer alleges that Nurses Calhoun and Weisner were deliberately indifferent to her medical needs by failing to effectively communicate the seriousness of her symptoms to the providers thereby delaying treatment. This is similar to *Berry* in which the Seventh Circuit held the jail nurse could be liable for blindly deferring to a doctor's order despite knowing it could harm the patient. *Id.*  Thus, there is settled authority that their actions violated Ms. Spencer's rights.

A non-medical defendant will not be liable if he reasonably relied on the judgment of medical personnel. *Miranda*, 900 F.3d at 343. But here, there is a material dispute of fact as to whether Officer Martoccia actually relied on medical personnel's judgment or whether he ignored Ms. Spencer's complaints. Although he looked into Ms. Spencer's first grievance, he had a conversation with her based on her subsequent letter to the sheriff. There is no documentation that he followed up with medical staff after this conversation. He also told Ms. Spencer that treatment may not be provided if her condition was not life-threatening. A jury could infer that the lack of follow-up was due to Officer Martoccia's personal assessment that her condition was not life-threatening. And it is well-established that a defendant may be liable if he has personal knowledge of a constitutional deprivation and does nothing. *Perez*, 792 F.3d at 782 ("An inmate's correspondence to a prison administrator may thus establish a basis for personal liability . . . where that correspondence provides sufficient knowledge of a constitutional deprivation."); *Greeno v. Daley*, 414 F.3d 645, 655−56 (7th Cir. 2005) (positing that non-medical defendant could be deliberately indifferent if he ignored plaintiff's complaints of lack of medical care); *Miranda*, 900 F.3d at 343 ("[I]f jail officials had reason to know that medical staff were failing to treat or inadequately treating an inmate, liability is possible.").

Accordingly, defendants Nurse Calhoun, Nurse Weisner, and Officer Martoccia are not entitled to qualified immunity.

## IV. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment, dkt. [35], is **granted in part and denied in part**. It is **granted** as to all claims against Sheriff Matt Myers and **granted** as to claims about the medical care Ms. Spencer received after October 10, 2019. The **clerk is directed to terminate** Sheriff Matt Myers as a defendant. No partial final judgment shall

issue at this time. It is **denied** as to claims against Nurse Calhoun, Nurse Weisner, and Officer Martoccia for Ms. Spencer's medical issues between May 10, 2019, and October 10, 2019. These claims shall proceed to settlement or trial if one is necessary.

The Court prefers that Ms. Spencer be represented by counsel at a settlement conference and trial. The Court has prepared a form motion to be used by indigent litigants seeking the appointment of counsel. The form requests the information necessary for the Court to determine the merits of the motion, and it requires the litigant to acknowledge important conditions of the appointment of counsel. Ms. Spencer shall have **through February 24, 2022,** in which to either return a completed motion for counsel form to the Court or object to the recruitment of counsel on her behalf. **The clerk is directed** to include a copy of the motion for counsel form with Ms. Spencer's copy of this Order.

**IT IS SO ORDERED.**

Date:   2/9/2022

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

AMANDA DELEAN SPENCER
238289
ROCKVILLE - CF
ROCKVILLE CORRECTIONAL FACILITY
Inmate Mail/Parcels
811 West 50 North
Rockville, IN 47872

Rosemary L. Borek
STEPHENSON MOROW & SEMLER
rborek@stephlaw.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com